**Monica MILLER, Plaintiff,**

v.

**WELLS DAIRY, INC., d/b/a Wells Blue Bunny, Defendant.**

**No. C01–4072–MWB.**

United States District Court, N.D. Iowa, Western Division.

March 25, 2003.

Michael J. Carroll, Coppola, Sandre, McConville & Carroll, PC, West Des Moines, IA, for Plaintiff.

Richard H. Moeller, Berenstein Moore Berenstein, Heffernan & Moeller, LLP, Sioux City, IA, for Defendant.

**MEMORANDUM OPINION AND OR-DER REGARDING DEFEN-DANT'S MOTION FOR SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I.   *INTRODUCTION* ....................................................... 801
    A.   *Procedural Background* ................................................ 801
    B.   *Disputed And Undisputed Facts* ....................................... 801

II.  *LEGAL ANALYSIS* ...................................................... 804
    A.   *Standards For Summary Judgment* .................................... 804
    B.   *Miller's ADEA Claim* ................................................ 805
    C.   *Miller's Claims Under The ADA* ...................................... 806
        1.   *Actual disability claim* ........................................... 806
        2.   *"Regarded as" disability claim* .................................... 809

D. *Discharge in Violation of Public Policy Claim* ..........................811

III. *CONCLUSION* ..................................................................814

## I.  INTRODUCTION

### A.  Procedural Background

On July 10, 2001, plaintiff Monica Miller ("Miller") filed a complaint against her former employer, defendant Wells Blue Bunny ("Wells"), seeking damages resulting from her termination in April 2000. In her complaint, Miller alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, *et seq.,* and Iowa public policy. Defendant Wells answered Miller's complaint on August 20, 2001, denying Miller's claims and asserting in its defense that Miller's age discrimination under the ADEA is barred because she failed to timely exhaust her administrative remedies.

On January 21, 2003, defendant Wells filed a Motion for Summary Judgment on all of Miller's claims. In its motion, Wells first argues that Miller is not a qualified individual with a disability because her condition does not substantially limit one or more of her major life activities. Secondly, Wells contends that it is entitled to judgment as a matter of law on Miller's claim under the ADEA because she made no mention of age bias in her complaint to the Iowa Civil Rights Commission and therefore failed to exhaust her administrative remedies. Third, Wells asserts that

no evidence of causation exists regarding Miller's claim of retaliatory discharge. On March 4, 2003, Miller resisted Wells's motion for summary judgment, arguing that there are genuine issues of material facts in dispute regarding her claims under the ADA and Iowa Public Policy.[1]

On March 11, 2003, Wells filed a reply brief in support of its motion for summary judgment.[2] On March 14, 2003, Miller requested oral argument on the motion for summary judgment. The court granted that request and held oral arguments on Wells's motion on March 17, 2003.

At the hearing, Ms. Miller was represented by Michael Carroll of Coppola, Sandre, McConville & Carroll P.C., West Des Moines, Iowa. Wells was represented by Richard Moeller of Berenstein, Moore, Berenstein, Heffernan & Moeller, L.L.P., Sioux City, Iowa. A trial in this matter is presently scheduled for April 21, 2003. Before discussing the standards for Wells's Motion for Summary Judgment, however, the court will first examine the factual background of this case.

### B.  Disputed And Undisputed Facts

Whether or not a party is entitled to summary judgment ordinarily turns on whether or not there are genuine issues for trial, *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th

---

1. Plaintiff Miller alleges in her resistance (# 23) that she "is able to prove a *prima facie* case of disability discrimination under the ADA and the ICRA," which the court understands Miller to allege disability discrimination claims under both the ADA and the Iowa Civil Rights Act ("ICRA"), chapter 216 of the Iowa Code. Pl.'s Resistance, at 15. However, Miller's Complaint with Jury Demand (# 1) does not plead a claim of disability discrimination, nor any other claim, under the ICRA.

Therefore, such claim(s) are not before the court for its consideration.

2. On March 10, 2003, plaintiff Miller moved to supplement the record and the court granted Miller's motion. Miller filed her supplement to the record on March 21, 2003, and the court has considered the supplement in conjunction with the remainder of the record in reaching its conclusion.

Cir.1990), and the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). Thus, a summary of the undisputed and disputed facts is essential to the disposition of Wells's Motion for Summary Judgment.

In September of 1999, Miller began working for Wells as a full-time quality control lab technician ("lab tech"). As a lab tech, Miller was responsible for sampling, testing, and analyzing Wells's ice cream and novelty products on one or more of its production lines at its South Ice Cream Plant in Le Mars, Iowa. Miller was hired to work six, ten-hour days per week on the night shift. Miller was regularly assigned one to three different product lines, located on the first or second floors of the plant. On November 30, 1999, during her shift, Miller injured her left knee when she ascended stairs between the first and second floors of the plant. On December 3, 1999, Miller saw her physician, Dr. Steven Meyer, who determined that Miller was suffering from a "significant return of her left knee pain" due to chondromalacia patella. Def.'s App., at F, 1. Miller's condition—chondromalacia patella—was first diagnosed in March 1997, and predated her employment with Wells. Def.'s App., at F, 1. Dr. Meyer permitted Miller to return to work on December 3, but restricted her to light duty work. In addition, Miller's medical release from Dr. Meyer did not permit her to squat, crawl, kneel, or climb stairs. Wells modified Miller's work responsibilities in accordance with Dr. Meyer's medical release for one month, per an agreement between Miller and Brian Pietz ("Pietz"), her lab department supervisor, on behalf of Wells. The agreement did not create a permanent change in Miller's position or duties at Wells. Instead, at the conclusion of one month, Miller was to return to her doctor, after which time, the agreement specified that Wells would determine if it could continue to accommodate Miller's restrictions. However, Miller continued to perform light duty work well over a month until she was able to be re-evaluated by Dr. Meyer on February 15, 2000.

At the February 15, 2000, doctor's visit, Miller was placed on permanent restrictions which required her to "refrain completely from stair climbing, kneeling, and squatting." Dr. Meyer released her to work with these permanent restrictions and Pietz informed Miller that she would continue with her light duty work until such time that he was able to determine how to accommodate her restrictions on a permanent basis. Thereafter, Miller met with her immediate supervisor, Lorraine Tilberg, to discuss which lines Miller thought she could test, sample, and analyze Wells's products with her permanent restrictions. At the meeting with Tilberg, Miller indicated she could perform the functions of eleven of the fourteen lines. After her meeting with Tilberg, Miller was assigned one line and other light duty tasks which did not pose any physical problems for Miller.

On March 20, upon her return to work after an absence due to bronchitis, Wells assigned Miller four lines and the load, another term for responsibility for the brines, tank temps and mixes. Pl.'s Dep., at 96. Prior to March 20, Miller had not been assigned four lines and the load, prompting Miller to approach Tilberg and ask for an explanation. According to Miller, Tilberg became angry with Miller and told her to "Get your butt in motion. You have more than the one line tonight." Pl.'s Dep., at 98. After further questioning, Tilberg allegedly told Miller that she had

to work four lines and the load because "The big guys want you back out on the floor." Pl.'s Dep., at 100. Miller told Tilberg that she could not work four lines and the load. Wells asserts that Miller told Tilberg that she could not work four lines because she was still recovering from the bronchitis. Miller admits to having told Tilberg that she was still out of breath from the bronchitis and shaky, but claims that she also asked Tilberg if she could go ahead and use the elevator to do the shift, but Tilberg refused and told her "That [the elevator] will not be available anymore." Pl.'s Dep., at 102. Tilberg proceeded to call Pietz who joined the meeting, and according to Miller told her that the restrictions were going to have to be removed, including the use of the elevator. Pl.'s Dep., at 105. Miller claims that as she and Tilberg continued to talk, Miller became upset, and started to shake and cry. Miller tendered her resignation to Pietz who refused to accept it and told her to go home and think things over. As Miller was leaving the plant that night, she tripped and fell and required medical attention.

On April 3, 2000, Miller was able to return to work on a shortened shift. However, at Pietz's urging, Miller did not return to work until she received a medical release to work full shifts beginning April 17, 2000.[3] Before returning to work, Miller's attorney, Roger Carter of Sioux City, wrote a letter to Wells on April 12, 2000, demanding payment of Miller's workers' compensation claims as a result of her fall in the plant parking lot. Additionally, the letter addressed placing Miller in the allergen lab tech position as a possible accommodation.

Sometime before returning to work, Miller spoke with Pietz about the allergen lab tech position. According to Miller, Pietz thought it was the perfect job for her because all of the analysis is performed in one room on one floor. Miller claims that Pietz assured her that if the allergen lab tech job was not full-time, that Miller would be kept busy with computer work. However, Miller contends that she received conflicting information about the responsibilities associated with the position during her interview with Wells's Human Resources manager, Sandy Francis. Miller alleges that Sandy told her that "It's going to entail a lot of running out, grabbing samples, going up and down stairs to grab samples from a truck." Pl.'s Dep., at 125. In addition, Miller alleges that Sandy told her that she would only be working four hours a day, four days a week. Thus, when Miller received a letter offering her the allergen lab tech position, Miller turned it down because it was only part-time with no benefits. However, Miller argues that James Straight filled the position in June 2000, and maintained full-time hours.

When Miller returned to the Wells plant on April 17, she met with Pietz to discuss what she would be doing. Miller alleges that she told Pietz that, with the exception of some infrequent dizzy spells, she felt fine and was ready to go back to work. According to Miller, Pietz told her that "Your knee was bad enough, and now with your concussion, I can't, in good conscious, put you back out on the floor." Pl.'s Dep., at 129.

On the contrary, in Miller's estimation, she could have performed her previous lab tech job functions with her permanent physical restrictions when she returned to work on March 20, 2000, just as well as she had performed them before she in-

---

**3.** Miller was still subject to her permanent physical restrictions including no squatting, crawling, kneeling, and stair climbing.

jured her knee in November 1999. When Miller returned to work on March 20, she was not experiencing pain when she walked and her doctor had not imposed any restrictions on her ability to walk. Pl.'s Dep., at 83. According to Miller, she was simply slower in her walk, yet capable of working a full, ten hour shift with the accommodation of the elevator so as to avoid climbing the stairs. Pl.'s Dep., at 84, 89. However, Miller did admit to being able to climb the two or three stairs leading up to the individual lines without difficulty by using the handrail and taking the stairs one at a time. Pl.'s Dep., at 64.

Miller alleges her knee injury and subsequent permanent physical restrictions have effected the way she functions outside of the workplace. Although Miller admits to an ability to walk without restriction, she does not walk "as much as I [Miller] used to" and "after a little while, my knee starts burning." Pl.'s Dep., at 92. The distance Miller is capable of walking is dependent upon the particular day and where she is walking, "If I'm on a plane ... level plane, then I could go further, like a floor. I could do quite well." Pl.'s Dep., at 92. Miller asserts that she is unable to walk her dog, but attributes her inability to do so to the fact that the dog is a huge Malamute, and therefore a "puller," causing her knee to be pulled out. Pl.'s Dep., at 92. Miller also claims she is limited in her ability to kneel and squat, which prohibits her, for instance, from getting items from cupboards and cleaning floors.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Summary judgment is appropriate when the court after viewing all of the facts, and inferences drawn from those facts, in the light most favorable to the non-moving party, and giving that party the benefit of all reasonable inferences that can be drawn from the facts, concludes there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); See Dropinski v. Douglas County, Neb., 298 F.3d 704, 706 (8th Cir.2002); P.H. v. Sch. Dist. of Kansas City, Mo., 265 F.3d 653, 658 (8th Cir.2001) (nonmoving party, "is entitled to all reasonable inferences-those that can be drawn from the evidence without resort to speculation.") (quoting Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir.2001) (internal quotations omitted); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's function at the summary judgment stage of the proceedings is not to "to weigh evidence in the summary judgment record to determine the truth of any factual issue; we merely determine whether there is evidence creating a genuine issue for trial." Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir.1999) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

According to Rule 56(e), once the moving party files a properly supported motion for summary judgment, the burden shifts to the nonmoving party to point out genuine issues of material fact that would preclude judgment as a matter of law for the moving party. See Fed.R.Civ.P. 56(e); Bennett v. Dr Pepper/Seven Up, Inc., 295 F.3d 805, 808–09 (8th Cir.2002); Naucke v. City of Park Hills, 284 F.3d 923, 927 (8th Cir.2002) (explaining, "a nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.") (citing F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir.1997), quoting Rolscreen Co. v. Pella Prods. of St. Louis, Inc., 64 F.3d 1202, 1211 (8th Cir.1995)); Bailey v. U.S. Postal Serv., 208 F.3d 652, 654 (8th Cir. 2000) (nonmoving party "may not rest

upon 'mere allegations or denials' contained in its pleadings, but must, by sworn affidavits and other evidence, 'set forth specific facts showing that there is a genuine issue for trial.' ") (quoting Fed.R.Civ.P. 56(e)); *Mathews v. Trilogy Communications, Inc.,* 143 F.3d 1160, 1164 (8th Cir. 1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, the party opposing summary judgment "must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." *P.H.,* 265 F.3d at 658 (quoting *Buettner v. Arch Coal Sales Co.,* 216 F.3d 707, 718 (8th Cir.2000), *cert. denied,* 531 U.S. 1077, 121 S.Ct. 773, 148 L.Ed.2d 672 (2001). The consequence of a nonmoving party's failure of proof concerning an essential element of the case "renders all other facts immaterial," and in such a case, no genuine issue of fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court looks to the substantive law to determine if an element is 'essential' to the underlying case. *Id.* Therefore, the movant is entitled to summary judgment where the factual dispute does not affect the outcome of the case under the governing law. *See Jackson v. Arkansas Dept. of Educ., Vocational & Tech. Educ. Div.,* 272 F.3d 1020, 1025 (8th Cir.2001), *cert. denied,* — U.S. —, 122 S.Ct. 2366, 153 L.Ed.2d 186 (2002) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment discrimination cases." *See Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "Because discrimination cases often turn on inferences rather than on direct evidence ..." *E.E.O.C. v. Woodbridge Corp.,* 263 F.3d 812, 814 (8th Cir.2001) (*en banc*) (citing

*Crawford,* 37 F.3d at 1341; *Conopco, Inc.,* 186 F.3d at 1101 (citing *Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1205 (8th Cir. 1997), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels,* 137 F.3d 1069, 1071 (8th Cir.1998) (citing *Gill v. Reorganized Sch. Dist. R–6, Festus, Mo.,* 32 F.3d 376, 378 (8th Cir. 1994)). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher,* 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur,* 47 F.3d 953, 959 (8th Cir.1995)). The fact remains that "the ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1315 (8th Cir.1996) (quoting *Crain v. Board of Police Comm'rs,* 920 F.2d 1402, 1405–06 (8th Cir.1990)). The court will apply these standards to Well's Motion for Summary Judgment, addressing each of the disputed issues in turn.

### B. Miller's ADEA Claim

As an initial matter, the court addresses Wells's contention regarding Miller's age discrimination claim under the ADEA. Wells asserts that Miller's claim is barred because she failed to timely exhaust her administrative remedies. However, Miller concedes in her Resistance to Wells's Motion for Summary Judgment that there are no genuine issues of material fact with regard to her age discrimination claim under the ADEA and therefore, the court

will grant that part of Wells's Motion for Summary Judgment.

### C. Miller's Claims Under The ADA

The ADA affords protection from discrimination to any "qualified individual with a disability." 42 U.S.C. § 12112(a). The Eighth Circuit Court of Appeals has held that a plaintiff who raises a claim of disability discrimination based on indirect evidence bears the initial burden of establishing a *prima facie* case of discrimination before the burden of proof shifts to the employer to present evidence of a legitimate, non-discriminatory reason. *Yates*, 267 F.3d at 799. If the employer offers evidence of a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to show that the employer's explanation is a pretext for discrimination. *Id.* "The burden of persuasion remains with the plaintiff throughout." *Id.* citing (*Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776–77 (8th Cir.1995). Thus, in order for Miller to recover on her ADA claim, she must establish that, at the time she alleges she was discriminated against: (1) she was disabled within the meaning of the ADA, (2) she was qualified to perform the essential functions of her job, with or without reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. *E.g. Dropinski v. Douglas County, Neb.*, 298 F.3d 704, 706 (8th Cir.2002); *Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847, 850 (8th Cir.2002); *Conant*, 271 F.3d at 784; *Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1087 (8th Cir.2001) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir.1999) (en banc)); *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir.2001); *Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 678 (8th Cir.2001); *Treanor v. MCI Telecomm. Corp.*, 200 F.3d 570, 574 (8th Cir.2000); *Cravens v. Blue Cross & Blue Shield*, 214 F.3d 1011, 1016 (8th Cir.2000).

Under the ADA, a "disabled person" either (1) has a "physical or mental impairment that substantially limits one or more of the [person's] major life activities[,]" (2) has "a record of such an impairment," or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2)(A), (B), (C). An employer is prohibited from discriminating against a qualified employee solely on the basis of a disability. 42 U.S.C. § 12112(a). Here, Miller seeks to establish her *prima facie* case of disability discrimination against Wells based on subsections (A) (actual disability) and (C) (perceived disability). The court will begin its discussion by addressing Miller's actual disability allegation.

#### 1. Actual disability claim

Wells contends that Miller cannot establish a *prima facie* case of disability discrimination because she cannot demonstrate that she is disabled. Miller asserts that her impairment consists of an injury to her left knee. Wells concedes that Miller can generate a genuine issue of material fact that she has a physical impairment. However, Wells argues that Miller's physical impairment does not substantially limit any major life activity. Thus, in considering whether Miller can make out a *prima facie* case of discrimination under the ADA, the court must first determine whether Miller is "disabled" as defined by the ADA; that is, whether she has a physical or mental impairment that substantially limits one or more of her major life activities. As this court very recently explained,

The Equal Employment Opportunity Commission ("EEOC") has issued regulations defining the three elements of disability contained in subsection (A). *See* 29 C.F.R. § 1630.2 (2002). Those elements are: (1) a physical or mental impairment; (2) that affects a major life activity; (3) and whose effects substan-

tially limit that activity. *See id.; accord Bragdon v. Abbott,* 524 U.S. 624, 631[, 118 S.Ct. 2196, 141 L.Ed.2d 540] (1998) (directing district courts to perform three step inquiry to assess whether a particular condition constitutes a disability for purposes of subsection (A) of 42 U.S.C. § 12102(2)). "Physical or mental impairment" is defined as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine." *Id.* § 1630.2(h)(1). "Major Life Activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i). In addition, the Eighth Circuit has expanded upon the non-exhaustive list found in the regulations and has held that sitting, standing, lifting, and reaching may also qualify as major life activities. *Cooper [v. Olin Corp.],* 246 F.3d [1083,] 1088 [ (8th Cir.2001) ] (citing *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 948 (8th Cir. 1999)); *cf. Bragdon,* 524 U.S. at 639[, 118 S.Ct. 2196] (emphasizing that the regulations provide an illustrative, rather than exhaustive, list of major life activities). Further, in *Toyota Motor Manufacturing v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), the Court explained that " '[m]ajor life activities' ... refers to those activities that are of central importance to daily life." *Id.* at 691, 122 S.Ct. 681. The ADA's "substantially limits" requirement indicates that an impairment must interfere with a major life activity " 'considerabl[y]' or 'to a large degree." *Id.*

*Barnes v. Northwest Iowa Health Center,* 238 F.Supp.2d 1053, 1068 (N.D.Iowa 2002) (footnote omitted); *see Martinez v. Cole Sewell, Corp.,* 233 F.Supp.2d 1097, 1127–28 (N.D.Iowa 2002).

Miller asserts in her brief that her left knee condition substantially limits her in the major life activities of walking, standing, bending, stooping, squatting, and kneeling. Wells does not contest, nor can it, that walking is a major life activity. 29 C.F.R. § 1630.2(i) (2002); *see Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 960 (8th Cir.2000); *Weber v. Strippit, Inc.,* 186 F.3d 907, 914 (8th Cir.1999). In addition, Wells recognizes that the physical activities of standing and bending may also qualify as major life activities. *Cooper,* 246 F.3d at 1088 (citing *Fjellestad,* 188 F.3d at 948; *Webner v. Titan Dist., Inc.,* 101 F.Supp.2d 1215, 1221 (N.D.Iowa 2000), *rev'd on other grounds by* 267 F.3d 828 (8th Cir.2001). As evidence of her alleged disability, Miller identifies specific activities that are directly impacted by her left knee condition, including walking up stairs, walking her dog, riding her horse, and her inability to kneel and squat, which prohibits her, for instance, from getting items from cupboards and cleaning floors. With regard to the physical activity of walking up stairs, the Eighth Circuit Court of Appeals analyzes such physical activity within the broader category of walking. *Weber v. Strippit, Inc.,* 186 F.3d 907, 914 (8th Cir. 1999) (finding plaintiff's difficulty climbing stairs only a "moderate limitation" on the major life activity of walking) (citing *Kelly v. Drexel Univ.,* 94 F.3d 102, 106 (3rd Cir.1996) (affirming the district court's determination that plaintiff's "trouble climbing stairs ... does not substantially limit his ability to walk" where plaintiff claimed he was substantially limited in the major life activity of walking)); *see also Hanson v. Prairie Material Sales, Inc.,* 2001 WL 1105097, *7 (N.D.Ill. Sept.20, 2001) (con-

cluding plaintiff was not substantially limited in the major life activity of walking although he required help walking up stairs).

Aside from walking, standing, and bending, however, none of these other activities qualify as major life activities. *Weber*, 186 F.3d at 914 (finding shoveling snow, gardening, mowing the lawn, playing tennis, fishing, and hiking were not major life activities); *see also Marinelli v. City of Erie, Pennsylvania*, 216 F.3d 354, 362–63 (3rd Cir.2000) (deciding "cleaning" or "doing housework" is not a major life activity, citing other courts holding the same) (citing *Weber*, 186 F.3d at 914). Furthermore, "Major life activities do not include those activities that, although important to the individual plaintiff, are not significant within the meaning of the ADA." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir.1999) (citing *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir.1999) (holding that attending day care is not a major life activity); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998) (holding that gardening, golfing and shopping are not major life activities), *cert. denied*, 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999)). Thus, while Miller may have enjoyed walking her dog and riding her horse before she reinjured her left knee, these activities are not the category of activities that Congress intended to include as "major."

In consideration of Miller's claims concerning those activities which qualify for treatment as major life activities, the court is mindful of the Eighth Circuit Court of Appeals's explanation in *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 424–25 (8th Cir. 1999):

> A major life activity is substantially limited if an individual is unable to "perform a basic function that the average person in the general population can perform" or is significantly restricted in

"the condition, manner, or duration under which [she] can perform a particular major life activity as compared to an average person in the general population." *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1206 (8th Cir.1997); *see* 29 C.F.R. § 1630.2(j)(1) (1998). Whether a major life activity is substantially limited is an individualized and fact-specific inquiry. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998).

*See Taylor*, 214 F.3d at 960.

Although Miller claims that she is substantially limited from the major life activity of standing, she does not identify how, if at all, her knee condition considerably, or to a large degree, effects the condition, manner, or duration under which she can stand. In fact, Dr. Meyer concluded on February 15, 2000, at an OV–Orthopaedic Exam, that Miller's pain "is really reasonably controlled when she is standing" and did not proceed to recommend, neither temporarily or permanently, limitations on the intervals in which Miller stood despite placing Miller on permanent restrictions from stair climbing, kneeling, and squatting during that same examination. Therefore, the court concludes that Miller has not adduced sufficient evidence from which no jury could reasonably find that Miller was substantially limited in the major life activity of standing. Similarly, in the absence of evidence establishing how, if at all, Miller's impairment significantly restricted the condition, manner, or duration under which she was able to bend compared to the general population, the court finds that no jury could reasonably find that Miller was substantially limited in the major life activity of bending. Thus, Miller may proceed, if at all, only on the basis that her physical impairment to her left knee substantially limited her ability to walk.

Miller admits that she is able to walk and can walk quite well on a level surface, like a floor. Although Miller asserts that she is unable to walk as much as she used to, according to Miller, she was capable of working a full, ten hour shift at Wells on March 20, 2000, with the accommodation of the elevator. In fact, when Miller returned to work on March 20, 2000, she was not experiencing pain when she walked and her doctor had not imposed any restrictions on her ability to walk. Pl.'s Dep., at 83. In Miller's own words, "I was slower in my walk....just takes me longer." Pl.'s Dep., at 84. With regard to her limitations walking up stairs, Miller admits to being able to climb the two or three stairs leading up to the individual lines without difficulty by using the handrail and taking the stairs one at a time. Pl.'s Dep., at 64. According to Miller, Dr. Meyer's permanent restrictions prohibiting her from climbing stairs did not include these shorter flights of stairs. However, Miller contends that she is unable to walk up flights of stairs generally, and must use the elevator or walk up a ramp, where available.

The Eighth Circuit Court of Appeals in *Weber*, 186 F.3d at 914, held that difficulty walking long distances or climbing stairs without getting fatigued amounted to a moderate limitation on major life activities and did "not suffice to constitute a 'disability' under the ADA." *See also Taylor*, 214 F.3d at 960, 962 (affirming summary judgment for defendant where plaintiff claimed she was substantially limited in walking, but admitted she could walk up to and including one mile despite having to perform such activity in moderation); *Kelly*, 94 F.3d at 108 (finding plaintiff's degenerative joint disease of the right hip was an impairment and not a disability; walking with a limp and difficulty climbing stairs were moderate, not substantial, limitations on major life activity of walking). In *Hanson*, 2001 WL 1105097, at *7, the plaintiff

asserted that his back injury created a substantial limitation on his major life activity of walking. Specifically, the plaintiff alleged that he walked at a slower pace, experienced discomfort in his back when he attempted walking long distances, and occasionally needed help walking up stairs. *Id.* The *Hanson* court found that "A diminished rate and pace of walking is not a significant restriction on the manner of walking." *Id.* In addition, the court found that the plaintiff's inability to walk long distances without experiencing back discomfort was "not a significant restriction on the duration of his walking." *Id.* Similarly, the court concludes that Miller has not generated genuine issues of material fact that would allow a jury to find that the limitations on her ability to walk are anything more than moderate and thus do not qualify as substantial limitations on the major life activity of walking.

### 2. *"Regarded as" disability claim*

■ Miller also suggests that Wells may have terminated her because she was perceived as being disabled. Specifically, Miller claims that Wells believed she was substantially limited in working. Pl.'s Resistance, at 13. Miller may pursue such a claim against Wells without proving she suffers from an "actual" disability because "individuals who are 'regarded as' having a disability, but who are not actually disabled, can still fall within the protection of the ADA. *Conant v. City of Hibbing*, 271 F.3d 782, 784 (8th Cir.2001) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). According to the Eighth Circuit Court of Appeals, in "regarded as" actions, the plaintiff must show that the employer or potential employer " 'entertain[ed] misperceptions about the individual—it must [have] believe[d] either that one ha[d] a substantially limiting impairment that one [did] not have or that one ha[d] a substan-

tially limiting impairment when, in fact, the impairment [was] not so limiting.'" *Id.* (quoting *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139). In other words, it is not a question of whether the defendants treated the plaintiff adversely "because of his or her feelings about the plaintiff's physical or mental impairment," *Weber,* 186 F.3d at 915, but a question of whether the defendants' treatment of the plaintiff was a result of the defendants' harboring " 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Brunko v. Mercy Hosp.,* 260 F.3d 939, 942 (8th Cir.2001). Consequently, the analysis is the same under both the actually disabled and regarded as disabled claims. *Kellogg v. Union Pac. R. Co.,* 233 F.3d 1083, 1089 (8th Cir.2000) ("Thus, our analysis is the same as under an actually disabled claim, but the question here is whether Union Pacific regarded Kellogg as precluded from more than a particular job.") (citing *Murphy,* 527 U.S. at 521–22, 119 S.Ct. 2133; *Sutton,* 527 U.S. at 491–92, 119 S.Ct. 2139). Therefore, the court will embark upon the same analysis it conducted previously to address Miller's actual disability claims, but with "working" as the qualifying major life activity. Here then, the question is one of whether Miller has come forth with sufficient evidence regarding (1) the nature, severity, duration and impact of her disability, and (2) her inability to perform either a class of jobs or a broad range of jobs across various classes. *See* 29 C.F.R. § 1630.2(j)(2)(i)-(iii), (3)(ii), that could allow a jury to reasonably conclude that Wells regarded Miller as precluded from the major life activity of working.

The EEOC regulations instruct courts to address the major life activity of working only when no other major life activity is substantially affected by an impairment:

If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.

29 C.F.R. app. § 1630.2(j). Because the court has found that Miller has not generated a genuine issue of material fact as to whether her knee condition substantially limits other major life activities, the court will proceed to address working as a major life activity.

In *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 949 (8th Cir.1999), the Eighth Circuit Court of Appeals explained that "A person is substantially limited in working if she is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'" (quoting *Doane v. City of Omaha,* 115 F.3d 624, 627 (8th Cir.1997)). The regulations direct district courts to consider factors, such as the number and type of jobs from which the impaired individual is disqualified; the geographical area to which the individual has reasonable access; and the individual's job training, experience, and expectations, in order to determine whether a person is substantially limited in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(ii); *accord Duty v. Norton–Alcoa Proppants,* 293 F.3d 481, 491–92 (8th Cir.2002) (listing above factors); *Fjellestad,* 188 F.3d at 949 (listing above factors); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 617 (8th Cir.1997) (same). As this court described recently:

Like other major life activities, the determination of whether an individual is substantially limited in working must be made on a case-by-case basis. *Fjellestad,* 188 F.3d at 949 (personalized in-

quiry); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 488 (8th Cir.1996) (same). In *Webb v. Garelick Manufacturing Co.,* the Eighth Circuit Court of Appeals explained that "[a] court must ask 'whether the particular impairment constitutes for the particular person a significant barrier to employment.'" *Webb,* 94 F.3d at 488. Pertinent to defining the class of jobs used to determine disability are the persons's expertise, background, and job expectations. *Id.* "Finding that an individual is substantially limited in his or her ability to work requires a showing that his or her overall employment opportunities are limited." *Fjellestad,* 188 F.3d at 949 (citing *Miller v. City of Springfield,* 146 F.3d 612, 614 (8th Cir. 1998)); *accord, E.E.O.C. v. Woodbridge Corp.,* 263 F.3d 812, 815 (8th Cir.2001) ("In order to find that an individual is substantially limited in working, there must be a showing that his or her overall employment opportunities are limited.") (citing *Fjellestad,* 188 F.3d at 949); *Miller v. City of Springfield,* 146 F.3d 612, 614 (8th Cir.1998) (same).

*Barnes,* 238 F.Supp.2d at 1079.

In this case, Miller has come forward with no evidence to create a fact question as to whether her left knee condition substantially limited her major life activity of working. Proof that one is limited in the ability to perform either a class or broad range of jobs ordinarily entails evidence concerning the accessible geographic area, the numbers and types of jobs in the area foreclosed due to the impairment, and the types of training, skills, and abilities required by the jobs. *See* 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C); *see also Duncan v. Washington Metro. Area Transit Auth.,* 240 F.3d 1110, 1115–16 (D.C.Cir.) (en banc) ("[T]he ADA requires a plaintiff ... to produce some evidence of the number and types of jobs in the local employment market in order to show he is disqualified from a substantial class or broad range of

such jobs...."), *cert. denied,* 534 U.S. 818, 122 S.Ct. 49, 151 L.Ed.2d 20 (2001); *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1319 (8th Cir.1996) (employee not disabled within meaning of ADA absent evidence showing inability to perform class of jobs or broad range of jobs in various classes).

Furthermore, the court finds that Miller has adduced no evidence that would allow a jury to reasonably conclude that Wells believed Miller's knee condition constituted a substantially limiting impairment that precluded her from performing a broad range of jobs. In fact, Miller presented evidence that Wells offered her the allergen lab tech position, but Miller declined the offer because it was part-time without benefits. *See Hutchinson v. United Parcel Serv., Inc.,* 883 F.Supp. 379, 396 (N.D.Iowa 1995) (finding the plaintiff was not "disabled" because her ability to perform work similar to that formerly required of her was "proof that she has not been limited in this major life activity [of working]"). Even construing the facts in the light most favorable to Miller—i.e., that Wells believed that Miller's knee condition amounted to an impairment—the court finds that no jury could reasonably conclude that Wells believed Miller's alleged impairment was substantially limiting, particularly in light of the offer of the allergen lab tech position. *Conant,* 271 F.3d at 784. Presently, Miller is employed with MCI. Thus, to the extent Miller may have claimed that Wells regarded her knee condition as substantially limiting her major life activity of working, the court finds that she has failed to generate a material issue of genuine fact on this issue and grants summary judgment in Wells's favor on this claim.

### D. Discharge in Violation of Public Policy Claim

■ Miller also asserts a state-law claim of wrongful discharge in violation of public

policy. In particular, Miller contends in her brief that she was terminated after she sought legal assistance from an attorney, Mr. Carter, who contacted Wells requesting payment of Miller's workers' compensation benefits. Pl.'s Resistance, at 20. Iowa courts recognize a cause of action for common-law retaliatory discharge. *See, e.g., Smith v. Smithway Motor Xpress, Inc.,* 464 N.W.2d 682, 686 (Iowa 1990) (recognizing discharge in retaliation for pursuing rights under Iowa workers' compensation laws violates public policy and gives rise to common-law cause of action); *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 353 (Iowa 1989) (same); *Springer v. Weeks & Leo Co.,* 429 N.W.2d 558, 560–61 (Iowa 1988) (same). The elements of the claim include a showing of: "(1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two." *Teachout v. Forest City Cmty. Sch. Dist.,* 584 N.W.2d 296, 299 (Iowa 1998).

■ Wells and Miller agree that Miller made a claim for workers' compensation benefits in connection with her work-related injuries to her left knee and head, which is protected activity. *See Springer,* 429 N.W.2d at 560; *Smith,* 464 N.W.2d at 682. On April 17, 2000, after Miller's doctor released her to return to work, Miller met with Pietz to discuss her return to work. At the meeting, Pietz explained to Miller that "the way your knee is, with that limitation, and now with your concussion and the little bit of dizziness that you're having, I honestly cannot put you back out on the floor." Pl.'s Dep., at 129. When Miller asked Pietz whether she had a job any longer, Pietz stated that "You don't have a job as a lab tech anymore." Pl.'s Dep., at 130. Miller asked Pietz during that same meeting whether the allergen lab tech position was still available, to which Pietz responded "that he would see what he could do." Pl.'s Dep., at 132. Although Miller received a letter in the mail from Wells thereafter, offering her the allergen lab tech position to which she turned down, the court will assume for purposes of summary judgment, as do the parties, that Miller was terminated. Thus, the determinative issue in this case is whether Miller can generate a genuine issue of material fact with respect to the third prong of her *prima facie* case of wrongful discharge. Accordingly, the court will focus its attention on this last element.

As stated, the final element of a *prima facie* case of wrongful discharge in violation of public policy is a showing that the protected conduct, here, Miller's filing of a workers' compensation claim, caused the employer to dismiss the plaintiff. *See, e.g., Fitzgerald v. Salsbury Chemical Inc.,* 613 N.W.2d 275, 289 (Iowa 2000). "The protected conduct must be the determinative factor in the decision to terminate the employee." *Id.* (citing *Teachout,* 584 N.W.2d at 300–01). "A factor is determinative if it is the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision." *Teachout,* 584 N.W.2d at 302 (quoting *Smith v. Smithway Motor Xpress Inc.,* 464 N.W.2d at 686); *see also Sanford v. Meadow Gold Dairies, Inc.,* 534 N.W.2d 410, 412 (Iowa 1995) ("An essential element of the claim is a showing concerning the employer's specific motivation in firing; it must appear that the discharge was prompted by the filing of the workers' compensation claim."). While the causation standard is high, it generally "presents a question of fact. Thus, if there is a dispute over the conduct or the reasonable inferences to be drawn from the conduct, the jury must resolve the dispute." *Fitzgerald,* 613 N.W.2d at 289 (citing 2 HENRY H. PERRIT, JR., EMPLOYEE DISMISSAL LAW AND PRACTICE § 7.21, at 54 (4th ed.1998)). Further, in ruling on a motion for summary judgment,

the court's role is not to determine whether the plaintiff will prevail at trial; the court merely must ascertain whether the plaintiff has generated genuine issues of material fact. *Cf. Quick,* 90 F.3d at 1376–77; *Johnson,* 906 F.2d at 1237.

Miller, of course, argues there are genuine issues of material fact concerning whether Wells's decision to terminate her was because she filed for and received workers' compensation benefits. Miller asserts that Wells's attitude toward her changed after her attorney, Mr. Carter, contacted Wells about payment of her workers' compensation benefits. Specifically, Miller claims that before she sought legal assistance, Wells was "being nice; they wanted to talk to me . . . I was a good worker." Pl.'s Dep., at 138–39. According to Miller, it was this attitude change that led her to ask her mother-in-law to come with her when she met with Wells. However, Miller admits that her mother-in-law accompanied her to a meeting, regarding the new allergen lab tech position, with Sandy Francis and two other of Wells's Human Resource personnel prior to her attorney contacting Wells about her workers' compensation claim on April 12, 2000. Miller explained that her mother-in-law "was there to ride along with me, because we were going to get ice cream that day, and I asked her to please come in. I just felt like it was three against one, I guess is the way to say it." Pl.'s Dep., at 122. In addition, despite Miller's allegations that Wells's attitude changed after the letter of April 12, 2000, Miller divulged that her mother-in-law accompanied her to her meeting with Pietz on April 17, 2000 merely because "It was a long trip to come up here to Wells, so I had her ride along. She liked just riding along, but she didn't go into the office that time. . . . We were going to get some ice cream." Pl.'s Dep., at 130, 132.

Furthermore, Miller relies on the fact that she was allegedly discharged within a matter of weeks after her attorney, Mr. Carter, contacted Wells regarding her workers' compensation claims. Notwithstanding defense counsel's adamant protestations, in various contexts, the Eighth Circuit Court of Appeals has held that the causal connection between allegedly retaliatory action by the employer and protected activity by the employee can be established by proof that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive. *See Hansen v. Sioux By–Products,* 988 F.Supp. 1255, 1268–69 (N.D.Iowa 1997) (citations omitted). As this court explained in *Hansen:*

> Although the Iowa Supreme Court has stated that "[t]he mere fact that an adverse employment decision occurs after [protected activity] is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim," *Hulme II,* 480 N.W.2d at 43, the inference arising from such temporal proximity may be sufficient to preclude summary judgment, however hotly the issue may be contested at trial, particularly where temporal proximity is coupled with other evidence giving rise to an inference of illegal motive. *See Walters v. U.S. Gypsum Co.,* 537 N.W.2d 708, 712 (Iowa 1995).

*Id.* In *Hansen,* the court found that Hansen's termination the same day as he reported a work-related injury and sought medical treatment under his employer's workers' compensation coverage "raises inferences that may be sufficient to defeat a summary judgment motion by the employer." *Id.* at 1268–69; *see, e.g., Webner,* 101 F.Supp.2d at 1230 (five days between protected activity and adverse action was sufficient to establish a causal connection for purposes of a prima facie case of wrongful discharge).

In the present case, proof that adverse employment action occurred after protected employee conduct, without more, is insufficient to generate a fact question on the issue of whether the filing of Miller's workers' compensation claims were a determining factor in her discharge. *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 203 (Iowa 1997) (citing *Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992) (*Hulme II*)). Miller's receipt of Wells's offer of the allergen lab tech position sometime after her April 17, 2000, meeting with Pietz, lends credence to the fact that Miller's filing for workers' compensation benefits was not the determinative factor in Wells's decision to terminate Miller. Not to mention, Wells extended Miller the offer despite Miller's submission of claims with the Iowa Industrial Commissioner on April 17, 2000, for workers' compensation benefits arising from her work-related injuries.

### III.   CONCLUSION

Miller has failed to generate a genuine issue of material fact that she was either actually disabled or regarded as disabled by Wells within the meaning of the ADA. Miller concedes that there are no genuine issues of material fact with regard to her age discrimination claim under the ADEA. Finally, the court finds that Miller has not presented substantial evidence tending to prove her filing of workers' compensation claims was a determining factor in Wells's decision to terminate her. For these reasons, the court **grants defendant's Motion for Summary Judgment on all counts. This case is dismissed in its entirety.**

**IT IS SO ORDERED.**