PAUL SHEDLOCK vs. DEPARTMENT OF CORRECTION & others.[1]

Suffolk. September 7, 2004. - December 8, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Americans with Disabilities Act. Imprisonment,* Disabled prisoner. *Governmental Immunity. Words,* "Disability," "Qualified handicapped individual," "Reasonable accommodation."

In a civil action alleging that prison officials failed to provide reasonable accommodation for the plaintiff inmate's disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 (2000) (ADA); the Federal Rehabilitation Act, 29 U.S.C. § 794 (2000) (RA); and art. 114 of the Amendments to the Massachusetts Constitution, the plaintiff presented sufficient evidence to permit a finder of fact to determine that he had a disability under the ADA and the RA, due to his various longstanding injuries and pain that substantially limited a major life activity (walking and climbing), even with the benefit of a cane [848-852], and that he was handicapped under art. 114, given the allowable inference that the limitations on his ability to walk without a cane were substantial [852-854]; further, the trial judge's interpretation that a violation of the ADA, the RA, and art. 114 could only be premised on conduct that resulted in a complete exclusion from programs or total denial of benefits was overly narrow [854-855].

In a civil action alleging that prison officials failed to provide reasonable accommodation for the plaintiff inmate's disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 (2000) (ADA); the Federal Rehabilitation Act, 29 U.S.C. § 794 (2000) (RA); and art. 114 of the Amendments to the Massachusetts Constitution, the plaintiff presented sufficient evidence to permit a finder of fact to determine that the prison officials' transfer of the plaintiff to cells on floors above the first floor after the plaintiff had requested and obtained the requisite medical confirmation of his need for a first-floor cell was a denial of a reasonable accommodation under the ADA, the RA, and art. 114, and the judge erred in granting summary judgment in favor of the defendants on this claim [855-858]; however, the judge properly granted summary judgment in favor of the defendants with respect to the period prior to the plaintiff's having obtained such medical confirmation [858], as well as with respect to claims premised on alleged inaccessibility of other prison programs and services for which the defendant failed to request reasonable accommodation [858-859].

[1]The superintendent, unit manager, and three correction officers at the Massachusetts Correctional Institution at Norfolk (M.C.I., Norfolk).

In a civil action alleging that prison officials, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12203(a) (2000) (ADA), retaliated against the plaintiff inmate for having sought reasonable accommodation for his disability, the defendants named in their individual capacities were entitled to qualified immunity from suit, where, at the time of the alleged retaliation, it had not clearly been established that the ADA applied to prisons [859-862]; similarly, the Department of Correction (department) was immune from suit for claims arising out of the defendants' alleged retaliation, where the department had not consented to such a suit and where the plaintiff failed to present adequate appellate argument concerning whether Congress, in enacting the ADA, had the authority to abrogate the States' immunity under the Eleventh Amendment to the United States Constitution with regard to such claims [862-866].

CIVIL ACTION commenced in the Superior Court Department on July 15, 1998.

The case was heard by *Ralph D. Gants*, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Myong J. Joun* (*Howard Friedman* with him) for the plaintiff.

*Julie E. Daniele* (*Kevin Anahory* with her) for the defendants.

*Jane K. Alper, James R. Pingeon, & Sarah R. Wunsch*, for Disability Law Center & others, amici curiae, submitted a brief.

SOSMAN, J. The plaintiff, an inmate at the Massachusetts Correctional Institution at Norfolk (M.C.I., Norfolk), brought the present action complaining that prison officials had failed to provide reasonable accommodation for his disability (in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 [2000] [ADA], the Federal Rehabilitation Act, 29 U.S.C. § 794 [2000] [RA], and art. 114 of the Amendments to the Massachusetts Constitution), and that they had retaliated against him for asserting his right to such reasonable accommodation (in violation of 42 U.S.C. § 12203 [2000]). The defendants' motion for summary judgment was allowed, and the present appeal followed.[2] We transferred the case to this court on our own motion. For the following reasons, we conclude that Shedlock

[2]While the case has been pending, Shedlock was transferred to another facility, and his claim for injunctive relief with respect to the alleged inaccessibility of programs and services at M.C.I., Norfolk, was rendered moot. The only remaining claims are those for monetary damages.

has presented sufficient evidence to permit the finder of fact to conclude that he is a disabled or handicapped person within the meaning of the ADA, the RA, and art. 114; that, having obtained the requisite medical confirmation of his need for a first-floor cell, transferring Shedlock to cells on higher floors could be found to be a denial of a reasonable accommodation; that, given Shedlock's failure to make a request for reasonable accommodation with respect to any other programs or services, the defendants cannot be held liable for failing to extend such accommodation; and that the defendants are immune from suit with respect to Shedlock's damages claims for retaliation. The summary judgment in favor of the defendants is therefore affirmed in part and reversed in part, and the matter is remanded for further proceedings.

1. *Facts.* Viewed in the light most favorable to the plaintiff, the record reveals the following facts. In 1984, Shedlock sustained serious and permanent injuries as a result of a motor vehicle accident. A slip and fall some years later further aggravated those injuries. Shedlock now has a constellation of medical problems, including sciatica, degenerative joint disease, and left leg atrophy, and regularly suffers pain in his neck, shoulder, back, hip, knee, and ankle. Shedlock has developed a "severe antalgic gait," a limp adopted to minimize pain. In 1992, while he was incarcerated, Shedlock began using a cane, and he has used a cane continually since that time.

Shedlock was transferred to M.C.I., Norfolk, in November, 1997. His various medical problems were confirmed during an intake and classification review. On his arrival at M.C.I., Norfolk, Shedlock was housed on the second floor in Unit 8-1. On December 23, 1997, a correction officer attempted to move Shedlock to a new housing assignment on the second floor of another unit. Shedlock informed him that his disability prevented him from climbing stairs, and requested that he be housed on the first floor. The officer allegedly replied that they did not "cater to cripples" at M.C.I., Norfolk. The officer then contacted his sergeant, whereupon the sergeant ordered Shedlock to go to his new cell or go to the disciplinary segregation unit. Shedlock chose to go to the segregation unit, and was issued a disciplinary report for refusing a housing assignment.

On December 31, 1997, Shedlock was released from the segregation unit and was assigned to a first-floor cell. On January 13, 1998, a disciplinary hearing was held before a hearing officer, who found Shedlock guilty of disobeying an order and disrupting the orderly running of the institution with respect to the incident of December 23. In that ruling, the hearing officer noted that Shedlock's "medical folder" had been checked, and that there was nothing in those medical records to indicate that Shedlock could not climb stairs. According to Shedlock, the hearing officer advised him not to appeal the disciplinary ruling, and warned him that, if he appealed, his stay at M.C.I., Norfolk, would be "very bad." Shedlock nevertheless appealed from the ruling to the superintendent, who denied the appeal on February 2, 1998.

On February 4, 1998, medical personnel issued a special needs form indicating that due to Shedlock's "chronic lower back pain [and] arthritis in his ankle" and increased "difficulty climbing stairs," Shedlock should be housed on the first floor. Such forms, referred to as "medical orders," are transmitted to the deputy superintendent and to the manager of the unit where the inmate is housed, and are ordinarily received within one to three days of the date they are issued.[3] On February 5, the day after his medical order had issued, Shedlock was reassigned from his first-floor cell to a second-floor cell. When the correction officer ordered Shedlock to go to the second floor, Shedlock informed him that he had been issued a medical order requiring him to be housed on the first floor. The officer then went into the sergeant's office, and the sergeant returned to speak with Shedlock. Shedlock advised the sergeant that he had the requisite medical order, to which the sergeant replied that he "didn't care" and ordered Shedlock to go to the second floor or back to the segregation unit. Shedlock opted to move upstairs. Shedlock also spoke with the superintendent, explaining that he had obtained a medical order for first-floor housing. The superintendent took no action.

On June 3, 1998, Shedlock was reassigned to a cell on the

---

[3]Shedlock previously had obtained such medical orders with respect to his various needs, including his need for a cane, assignment to a bottom bunk, extra pillows, and avoidance of ankle restraints.

third floor of another unit. He filed the present action on July 15, 1998. On July 16, 1998, Shedlock was moved to a first-floor cell.

During his time at M.C.I., Norfolk, Shedlock tried to walk in the yard for one hour each day. Some days he was able to walk for as much as two hours. While he was able to take such walks on his "very good days," his symptoms would prevent him from walking on other days (as often as two or three times per week). Shedlock had to stand in line from twenty to forty minutes each day to receive his medication, which was "difficult" for him. In addition, it became increasingly difficult for Shedlock to climb stairs. Despite that difficulty, Shedlock was able to navigate the stairs to get to the dining hall on the first floor, and to visit inmates on other floors. When Shedlock's cell needed to be cleaned, he went down the stairs to the basement, where the supplies were kept, and then climbed the stairs back to his cell. He received the assistance of a fellow inmate to climb stairs to get to a computer class and to access the library. Shedlock wanted, but was unable, to use the gym, because it was located at the bottom of a flight of stairs that lacked handrails, and the alternate entrance, by which he could avoid those stairs, was too far away for Shedlock to walk in the permitted movement time. Shedlock was similarly unable to attend meetings of religious groups because they met in another building "and there's more stairs over there than [he] can deal with." At no time did Shedlock complain to prison officials about his difficulties getting to and from such programs as the gym, library, computer class, or religious groups, other than to remark (at a social event) that he thought the stairs to the gym should have handrails.

2. *Discussion.* a. *Qualified individual with a "disability" under the ADA and the RA.* Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The RA similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. The motion judge ruled that the facts, even when viewed in the light most favorable to Shedlock, were insufficient to establish that he suffered from a "disability" within the meaning of the ADA or the RA. We disagree.

The term "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (2000). The RA uses a comparable definition. 29 U.S.C. § 705(9)(B) (2000) ("physical or mental impairment that substantially limits one or more major life activities"). Here, Shedlock contends that his various long-standing injuries substantially limit his walking. There is no dispute that he suffers from a physical "impairment" as a result of those injuries and that walking constitutes a "major life activit[y]." See *Toyota Motor Mfg., Ky., Inc.* v. *Williams*, 534 U.S. 184, 197 (2002) (*Toyota Motor*); 45 C.F.R. § 84.3(j)(2)(ii) (2003). Rather, the issue is one of degree: does the impairment "substantially limit[]" Shedlock's walking?

To qualify as a "substantial" limitation on a major life activity, the limitation must be " 'considerable' or 'to a large degree.' " *Toyota Motor, supra* at 196, quoting Webster's Third New Int'l Dictionary 2280 (1976). The term "precludes impairments that interfere in only a minor way with the performance of [major life activities] from qualifying as disabilities." *Toyota Motor, supra* at 197. At the other end of the spectrum, however, the impairment does not need to be so substantial that the plaintiff is completely incapable of performing the major life activity in question. The ADA "addresses substantial limitations on major life activities, not utter inabilities." *Bragdon* v. *Abbott*, 524 U.S. 624, 641 (1998). A plaintiff's impairment qualifies as one that "substantially limits" a major life activity if the plaintiff is "[s]ignificantly restricted as to the condition, manner or duration . . . under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i), (ii) (2004).

For purposes of the ADA (and, to be consistent, the RA), the

court must consider the plaintiff's ability to perform major life activities while using corrective devices or taking mitigating measures. See *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 482 (1999). Here, the plaintiff uses a cane, and the issue, therefore, is whether his ability to walk while using a cane is "significantly restricted" compared to the ability of the average person.

The extent to which Shedlock's impairments restrict his ability to walk is a disputed issue. Shedlock claims that while he can walk on some days (and tries to walk for an hour a day), the pain is such that he is unable to walk for two to three days each week. He also claims that he can only walk slowly and with difficulty. His medical records reflect frequent complaints of pain in his back, legs, and ankles, and confirm that his limp is "severe." He has difficulty traversing stairs, for which he often needs assistance from other inmates.

The defendants point to Shedlock's activities as evidence that his impairment is not so limiting — e.g., the fact that Shedlock has voluntarily gone up and down flights of stairs to visit friends on other floors of the cell block, and that he has traversed stairs to get cleaning supplies for his cell. This evidence of what Shedlock has been able to do, in spite of his impairments, may be used to try to convince the fact finder that Shedlock's complaints of pain and difficulty are not to be credited and that the limitations on his ability to walk are not as severe as he claims. However, the fact that Shedlock has, at least on occasion, been able and willing to climb stairs does not preclude him from establishing that the difficulty and pain experienced while doing so significantly restricts his ability to perform that task. Nor does the fact that he is, at least at times, capable of traversing stairs prevent Shedlock from proving that his ability to walk is "significantly restricted" with respect to "condition, manner or duration" when compared to the walking ability of "the average person in the general population." 29 C.F.R. § 1630.2(j)(1)(i), (ii).

Both sides point to cases involving impairments affecting walking, with some cases finding a substantial limitation on the

plaintiff's ability to walk[4] and others concluding that the limitation was too insignificant to qualify as a disability.[5] While there are no specific rules governing whether a limitation on a plaintiff's walking qualifies as substantial, we note that in cases where a plaintiff uses some device to assist with walking and climbing (e.g., a cane, brace, or crutches), most courts have found a substantial limitation on the activity of walking. See *EEOC* v. *Sears, Roebuck & Co.*, 233 F.3d 432, 439 (7th Cir. 2000); *Belk* v. *Southwestern Bell Tel. Co.*, 194 F.3d 946, 950 (8th Cir. 1999); *Saunders* v. *Horn*, 959 F. Supp. 689, 692 (E.D. Pa. 1996). When assessing the impact of corrective devices on a plaintiff's ability to perform a particular activity, we must consider "both positive and negative" effects of those devices. *Sutton* v. *United Air Lines, Inc.*, *supra* at 482. Devices such as canes and crutches may assist a person to walk in the sense of providing stability and balance, but they also can have the "negative" effect of slowing the person's walking pace or making the task of walking more tiring. It is therefore not surprising that, despite the benefits of such devices, courts have found that persons who need canes and crutches in order to walk are "substantially limited" in their ability to walk. By comparison, courts finding that a person's impairment does *not* result in a substantial limitation on the ability to walk have frequently noted that the plaintiff did *not* need to use a cane, brace, or crutches. See *Banks* v. *Hit or Miss, Inc.*, 996 F. Supp. 802, 807 (N.D. Ill. 1998); *Howell* v. *Sam's Club No. 8160*, 959 F. Supp. 260, 265 (E.D. Pa. 1997); *Nedder* v. *Rivier College*, 944 F. Supp. 111, 117 (D.N.H. 1996).

---

[4]See *Belk* v. *Southwestern Bell Tel. Co.*, 194 F.3d 946, 950 (8th Cir. 1999); Purcell *vs.* Pennsylvania Dep't of Corrections, Civ. A. No. 95-6720 (E.D. Pa. Jan. 9, 1998); *Meling* v. *St. Francis College*, 3 F. Supp. 2d 267, 273 (E.D.N.Y. 1998); Koedding *vs.* Brinckerhoff, No. C-93-4394-VRW (N.D. Cal. Jan. 16, 1996); *Saunders* v. *Horn*, 959 F. Supp. 689, 692, 697 (E.D. Pa. 1996). See also *EEOC* v. *Sears, Roebuck & Co.*, 233 F.3d 432, 438-439 (7th Cir. 2000).

[5]See *Nedder* v. *Rivier College*, 944 F. Supp. 111, 116-117 (D.N.H. 1996); Stone *vs.* Entergy Servs., Inc., No. Civ. A. 94-2669 (E.D. La. June 20, 1995). See also *Kelly* v. *Drexel Univ.*, 94 F.3d 102, 107 (3d Cir. 1996), and cases cited; *Miller* v. *Wells Dairy, Inc.*, 252 F. Supp. 2d 799, 809 (N.D. Iowa 2003); *Stewart* v. *Weast*, 228 F. Supp. 2d 660, 662 (D. Md. 2002); *Penchishen* v. *Stroh Brewery Co.*, 932 F. Supp. 671, 674-675 (E.D. Pa. 1996); *Carlson* v. *Rent-A-Center, Inc.*, 237 F. Supp. 2d 114, 121-122 (D. Me. 2003).

Beyond the fact that Shedlock needs a cane in order to walk, detailed comparison of the specifics of Shedlock's claimed difficulties with the difficulties experienced by plaintiffs in other cases is not particularly useful. By its nature, resolution of whether a person's impairment substantially limits that person's performance of a major life activity requires an individual, case-by-case assessment. See *Toyota Motor, supra* at 199. There are no bright line rules with respect to precisely how limited a plaintiff's performance of a particular major life activity must be before it qualifies as "substantial." As such, general observations to the effect that "moderate difficulty walking or climbing stairs" does not suffice to establish a disability under the ADA, *Kelly* v. *Drexel Univ.*, 94 F.3d 102, 107 (3d Cir. 1996), merely beg the question — is a particular plaintiff's difficulty walking or climbing stairs only "moderate" or is it "substantial?" On this record, if the jury were to credit Shedlock's version of the extent and frequency of the pain and difficulty he experiences while trying to walk and climb stairs, the jury could conclude that Shedlock's ability to perform those tasks is substantially limited in comparison to the average person, and could thus find that Shedlock has a "disability" within the meaning of the ADA and the RA.

b. *Qualified "handicapped individual" under art. 114.* "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth." Art. 114.[6] Although art. 114 contains no definition of the term "qualified handicapped individual," the language of the amendment closely tracks the language of the RA, 29 U.S.C. § 794. See *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 159 & n.4 (1989). The parties and the motion judge agreed that with one exception discussed below, the term "handicapped" in art. 114 should be given a meaning consistent with the term "disability" as used in the RA, i.e., a "handicapped" individual for purposes of art. 114 is an individual who

---

[6]Actions to enforce the rights guaranteed by art. 114 of the Amendments to the Massachusetts Constitution are authorized by G. L. c. 93, § 103.

has "a physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 705(9)(B).

This definition is essentially identical to that used in G. L. c. 151B, § 1 (17) ("a physical or mental impairment which substantially limits one or more major life activities"). In construing that term for purposes of G. L. c. 151B, we have held that the limitations on a plaintiff's ability to perform major life activities are to be assessed *without* regard to the effects of any mitigating measures or corrective devices. *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 240, 241-242 (2001). The judge determined, and the parties agree, that our construction of the term "handicapped individual" for purposes of art. 114 should be consistent with our treatment of the same term in G. L. c. 151B, and that the effects of corrective devices should therefore not be considered when assessing whether a plaintiff's ability to perform a major life activity is substantially limited for purposes of a claim under art. 114. That determination was correct, for the same reasons articulated in *Dahill* v. *Police Dep't of Boston*, *supra* at 238-239 & n.9. There, we noted that as of 1983 when the protections for "handicapped" persons were enacted, St. 1983, c. 533, § 2, Federal jurisprudence interpreting the RA had not yet articulated any requirement that the impacts of corrective devices be included in determining whether a person was handicapped. *Id.* The same is true with respect to art. 114, which was adopted and approved in 1980, and is similarly modeled on the RA. We see no reason to impose on art. 114 a limitation that was not articulated until years later, as such a limitation was not likely intended by either the Legislature or the voters.

Here, the judge below concluded that Shedlock could not demonstrate the requisite substantial limitation on his ability to walk without his cane because there was essentially no evidence of his ability to walk without a cane. That absence of direct evidence (which stems from the fact that Shedlock has used a cane continually since 1992) does not prevent Shedlock from proving that he is "handicapped" within the meaning of art. 114. To the contrary, from the very fact that he needs a cane in order to walk, one could infer that his ability to walk without a cane is extremely limited. That inference is bolstered in Shed-

lock's case, as a genuine need for a cane presumably had to be established before prison officials would permit him to have such an object. A cane could be used by Shedlock — or by others — as a weapon, and in all probability, prison officials would not allow an inmate to have a cane for mere convenience or out of an abundance of caution. One could infer that, in the prison setting, canes would only be provided to those inmates who truly needed them in order to walk. Where, even with the added benefit of a cane, Shedlock may qualify as a disabled person under the ADA and the RA, and where he presumably would not be allowed to use a cane in prison absent severe difficulty, the evidence would support the inference that the limitations on Shedlock's ability to walk without a cane are substantial.

c. *Exclusion from participation or denial of benefits.* The ADA, the RA, and art. 114 all prohibit the same conduct: disabled persons may not be "excluded from participation in or be denied the benefits of" services, programs, or activities, and they may not "be subjected to discrimination." 42 U.S.C. § 12132. 29 U.S.C. § 794. Art. 114.[7] The motion judge reasoned that Shedlock had not demonstrated the requisite exclusion or denial of benefits, because he had, at all times, been physically able to get to and from his cell, and to and from programs he wished to attend, albeit "slowly, and with difficulty."

The judge's interpretation, to the effect that a violation could only be premised on conduct that resulted in a complete exclusion from programs or total denial of benefits, is overly narrow. At some level, the difficulties experienced in attempting to access programs and services become so great — so laborious, so painful — that a plaintiff's access has functionally been denied,

---

[7]Under the Americans with Disabilities Act, 42 U.S.C. § 12132 (ADA), the exclusion or discrimination must involve a "public entity." Under the Rehabilitation Act, 29 U.S.C. § 794 (RA), the exclusion or discrimination must involve a "program or activity receiving Federal financial assistance." Article 114 prohibits such exclusion or discrimination "under any program or activity within the commonwealth." See *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 159 & n.3 (1989) (because defendant was State agency, court did not need to consider application of art. 114 to private individuals).

even if the plaintiff could, at least in theory, get to and from the program or services. The ADA, the RA, and art. 114 also prohibit "discrimination," and deliberately requiring a plaintiff to endure unnecessary hardship in order to access a program or service, when that hardship could easily be eliminated by a reasonable accommodation, can amount to a form of "discrimination" against that plaintiff. Impediments to access do not have to be totally insurmountable in order to give rise to a claim under the ADA or the RA. See *Shotz* v. *Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (violation of ADA can occur even where plaintiff is not "completely prevented from enjoying a service, program, or activity"); *Bonner* v. *Lewis*, 857 F.2d 559, 563-564 (9th Cir. 1988) (claim by deaf mute prisoner that communication by means of telecommunication device and inmate interpreters was "extremely difficult and inadequate" sufficed for RA claim); *Schmidt* v. *Odell*, 64 F. Supp. 2d 1014, 1033 (D. Kan. 1999) ("fact that plaintiff was actually able to use most of the jail services does not preclude his [ADA and RA] claim in light of the fact he was able to do so only by virtue of exceptional and painful exertion which was contrary to a physician's instructions"). The fact that Shedlock was not totally excluded from his cell or from prison programs does not make it impossible for him to prove his claim under the ADA, the RA, and art. 114, and summary judgment should not have been granted on that ground.

d. *Request for reasonable accommodation in the prison setting.* We have recognized that art. 114 (and therefore comparable provisions in the ADA and the RA) "cannot be applied literally as an absolute in all instances." *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 160 n.5 (1989). This is particularly true in the prison setting. "[J]ust as constitutional rights of prisoners must be considered in light of the reasonable requirements of effective prison administration, so must statutory rights applicable to the nation's general population be considered in light of effective prison administration. The [RA] was not designed to deal specifically with the prison environment; it was intended for general societal application. There is no indication that Congress intended the [RA] to apply to prison facilities irrespective of the consider-

ations of the reasonable requirements of effective prison administration." *Gates* v. *Rowland*, 39 F.3d 1439, 1446-1447 (9th Cir. 1994). "[C]ourts must be mindful of the necessary balance between the ADA's worthy goal of integration and a prison's unique need for security, safety, and other penological concerns." *Miller* v. *King*, 384 F.3d 1248, 1266 (11th Cir. 2004). The assessment whether a proposed accommodation is "reasonable," or whether it would place an undue burden on the defendant, must therefore include consideration of the prison environment. "Terms like 'reasonable' and 'undue' are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory . . . ." *Crawford* v. *Indiana Dep't of Corrections*, 115 F.3d 481, 487 (7th Cir. 1997), abrogated on other grounds, *Erickson* v. *Governors of State Colleges & Univs. for Northeastern Ill. Univ.*, 207 F.3d 945, 948, 952 (7th Cir. 2000).

Here, we must first consider whether Shedlock communicated a request for accommodation. Prison officials are not required to anticipate a prisoner's unarticulated need for accommodation or to offer accommodation sua sponte. Indeed, such a requirement would effectively require prison officials to make assumptions about a prisoner's disability, whereas resort to assumptions and stereotypes concerning disabled persons is a harmful practice that Congress sought to deter by means of the ADA. See *Sullivan* v. *Neiman Marcus Group, Inc.*, 358 F.3d 110, 117 (1st Cir. 2004), quoting *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Rather, it is incumbent on the prisoner to request accommodation in the first instance. See *Lue* v. *Moore*, 43 F.3d 1203, 1206 (8th Cir. 1994) (no violation of RA where blind prisoner did not apply for program or request accommodations).[8] This is particularly true where, as here, prison officials had already accommodated Shedlock's disability by allowing him to have and use a cane. Shedlock acknowledges that with his cane, he was in fact walking in the yard, traversing stairs on a regular basis, and attending various prison programs.

---

[8] In cases alleging that an employer failed to provide reasonable accommodation to a disabled employee, we have similarly required that the employee begin the process by identifying what accommodations are needed. See *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002).

Where his ability to walk and climb stairs allegedly fluctuated to the point that he was sometimes incapable of performing those activities, prison officials would be unaware of the reason why Shedlock was not walking in the yard on a particular day, or not attending some program. Much of the difficulty allegedly encountered by Shedlock involved his subjective experience of pain while walking and climbing stairs, and unless and until he articulated the view that his cane was not a sufficient accommodation, prison officials would have no way of knowing that he needed some further accommodation.

In light of Shedlock's apparent abilities, it was also reasonable for prison officials to insist that his alleged need for further accommodation be reviewed and confirmed by medical personnel. Within the prison system, officials may legitimately desire to screen such requests and verify that an accommodation is genuinely needed before a prisoner is accorded what other prisoners would likely view as special treatment. Over his years in the prison system, Shedlock had submitted his requests for accommodation in that fashion, obtaining medical orders for such things as his cane, a bottom bunk, extra pillows, and an exemption from application of ankle restraints. Having accorded Shedlock those accommodations that were previously requested and verified through medical orders, prison officials should not be required to accede to Shedlock's unsubstantiated claim that he needed some further accommodation that had not been indicated by medical personnel familiar with his condition. We must therefore consider what accommodations Shedlock requested, and whether any request was properly submitted to and verified by medical personnel.

With regard to Shedlock's claim concerning his need to be housed on the first floor, Shedlock sought and obtained a medical order supporting his claimed need for that accommodation as of February 4, 1998. The defendants did not respond to that request for accommodation, but instead moved Shedlock to a second-floor (and later a third-floor) cell. The defendants contend that they were unaware of the fact that Shedlock had obtained that new medical order, but Shedlock claims that he advised them of the order on various occasions, beginning as early as February 5, 1998. He also has evidence that, as part of

the normal processing of such orders, medical personnel would transmit the orders to the deputy superintendent for his approval or denial, and to the manager in charge of the housing unit. Under that system, prison officials would be made aware of medical orders within one to three days of their issuance. Viewing the facts in the light most favorable to Shedlock, the jury could conclude that Shedlock's request for a first-floor cell was a request for a reasonable accommodation,[9] that it was properly verified by prison medical personnel and communicated to prison officials in early February, 1998, and that failure to grant him that reasonable accommodation was in violation of the ADA, the RA, and art. 114.

We agree with the defendants, however, that there can be no liability with respect to the period prior to Shedlock's obtaining a medical order verifying his need for a first-floor cell. While Shedlock points out that prison regulations did not state an absolute requirement of a medical order, it was still reasonable for prison officials to rely on the contents of medical orders that had been issued, and to insist that those medical orders be updated or modified before extending Shedlock additional accommodations. The duty to provide reasonable accommodation did not require prison officials to accept at face value Shedlock's unverified insistence that he needed to be housed in a first-floor cell. Prior to the date on which the defendants were apprised of the issuance of a new medical order, there was no proper request for further accommodation, and the defendants cannot be held liable for failing to honor a request that was not properly submitted to them.

With respect to Shedlock's claims premised on alleged inaccessibility of other prison programs, the defendants are entitled to summary judgment on the ground that Shedlock never requested any additional accommodation with respect to those programs. At no time did Shedlock complain that he did not have access to the gym, the library, or other programs; nor did he articulate what further accommodation he would need in

---

[9]The facility contains first-floor cells, which were then occupied by inmates who were not disabled. The defendants do not contend that assigning Shedlock to a first-floor cell involved any inordinate expense or institutional difficulty.

order to access those programs. His single statement, made during a social event, to the effect that a particular stairway in the prison needed handrails, cannot be treated as a request for accommodation of his disability. To the extent that Shedlock was experiencing too much pain and difficulty getting to and from various locations in the prison, he did not voice that concern to the defendants, nor did he seek any medical order that would support a request for the kinds of accommodations he now complains he was denied (e.g., additional time to get to the gym). As to those aspects of his complaint, the defendants were entitled to summary judgment, as they cannot be held liable for failing to accord accommodations that were never requested.

e. *Retaliation claim.* Shedlock also claims that the defendants violated the ADA when they unlawfully retaliated against him in various ways for his having sought reasonable accommodation. See 42 U.S.C. § 12203(a).[10] The motion judge ruled that the individual defendants were entitled to summary judgment on the ground that they were protected by qualified immunity and that, with respect to the Department of Correction (department), the ADA's antiretaliation provisions had not abrogated the State's immunity from suit under the Eleventh Amendment to the United States Constitution.

(i) *Qualified immunity.* The doctrine of qualified immunity shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982). For a right to qualify as "clearly established," the unlawfulness of the defendant's conduct "must be apparent" based on then existing law. *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987). See *Siegert* v. *Gilley*, 500 U.S. 226, 232 (1991) (right must be clearly established "at the time the defendant acted" to overcome defense of qualified immunity).

Here, Shedlock complains of allegedly retaliatory conduct that began in December, 1997, with additional retaliatory incidents continuing up until June 3, 1998. The defendants

[10]Shedlock's damages claim for alleged retaliation is brought solely under the ADA. At no time has he asserted a retaliation claim under the RA. See *Weber* v. *Cranston Sch. Comm.*, 212 F.3d 41, 48 (1st Cir. 2000).

contend that prior to the Supreme Court's decision in *Pennsylvania Dep't of Corrections* v. *Yeskey*, 524 U.S. 206 (1998) (*Yeskey*), it was not "clearly established" that the ADA (and hence its prohibition against retaliation) applied to prisons. While *Yeskey* resolved that question as of the June 15, 1998, date the opinion was issued, announcing that the language of the ADA "unmistakably includes State prisons and prisoners within its coverage," *id.* at 209, the question was unsettled prior to that date, with differing views expressed by various Federal courts. Compare *Crawford* v. *Indiana Dep't of Corrections*, 115 F.3d 481, 483 (7th Cir. 1997) (ADA applicable to prison programs), and *Duffy* v. *Riveland*, 98 F.3d 447, 455 (9th Cir. 1996) (same), with *White* v. *State*, 82 F.3d 364, 367 (10th Cir. 1996) (Title II of ADA not applicable to prisons), and *Torcasio* v. *Murray*, 57 F.3d 1340, 1344-1347 (4th Cir. 1995) (doubtful that ADA applies to prisons).[11] We agree with the defendants that when the courts were split on the fundamental question whether the ADA applied to them at all, it was not "clearly established" that they had to comply with the ADA.[12]

Shedlock points to the fact that *Yeskey* itself treated the issue

[11]That the issue was perceived as difficult at the time is best illustrated by the evolution of the view ultimately articulated by the United States Court of Appeals for the Seventh Circuit in *Crawford* v. *Indiana Dep't of Corrections*, 115 F.3d 481, 483 (7th Cir. 1997), abrogated on other grounds, *Erickson* v. *Governors of State Colleges & Univs. for Northeastern Ill. Univ.*, 207 F.3d 945, 948, 952 (7th Cir. 2000). In an earlier case, that court had expressed grave doubt as to the applicability of the ADA to prisons. *Bryant* v. *Madigan*, 84 F.3d 246, 248-249 (7th Cir. 1996). Seven months later, the court declined to resolve the question, despite the fact that the defendant in the case did not contest the applicability of the ADA. *Love* v. *Westville Correctional Ctr.*, 103 F.3d 558, 559-560 (7th Cir. 1996). The court again noted that the courts were divided on the issue, and declined to rule on it "until the matter is fully briefed in a proper adversary setting." *Id.* at 560. Then, in *Crawford* v. *Indiana Dep't of Corrections*, *supra*, the court, while still noting that "[t]he circuits that have addressed the question disagree about the proper answer," determined that "an educational program" in a prison, and a prison "library," were "program[s] of a public entity" within the meaning of the ADA, while "[i]ncarceration itself" was not a "program" or "activity."

[12]Notably, the United States Court of Appeals for the First Circuit had not announced its view of this disputed issue prior to *Pennsylvania Dep't of Corrections* v. *Yeskey*, 524 U.S. 206 (1998) (*Yeskey*). Cf. *Rouse* v. *Plantier*, 987 F. Supp. 302, 316 (D.N.J. 1997) (applicability of ADA to prisons became clearly established within United States Court of Appeals for the Third Circuit once issue decided therein). Shedlock points to the fact that there was a Federal

as straightforward, e.g., opining that prisons were "unmistakably" included under the ADA, and that the ADA "plainly covers [S]tate institutions *without* any exception that could cast the coverage of prisons into doubt" (emphasis in original). *Yeskey, supra* at 209. However, the fact that the Supreme Court, when it decided the issue, spoke in clear and unequivocal terms in its unanimous opinion does not change the fact that, prior to that time, other courts grappling with the issue had reached differing conclusions.[13] While there is much to be said, particularly with the benefit of hindsight, for the proposition that the ADA would ultimately be found applicable to State prisons, the temporal component of qualified immunity analysis requires us to recognize that that issue was unresolved at the time of the acts Shedlock complains of, and department officials could not be required to predict how the Supreme Court would resolve a statutory interpretation question that had received differing answers amongst lower Federal courts. "If [F]ederal appellate judges could reasonably disagree over the applicability of [the ADA and RA], we do not believe that it can be fairly said that a reasonable official would have known that his conduct violated

District Court opinion taking the position that the ADA applied to the Massachusetts Department of Correction. See *T.P.* v. *DuBois*, 843 F. Supp. 775 (D. Mass. 1993). That decision, however, predated the emergence of a split amongst the Circuit Courts of the United States Court of Appeals and cannot stand for the proposition that the issue was "clearly established" within this circuit in the absence of any announcement from the First Circuit itself.

Shedlock also suggests that this court's decision in *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156 (1989), would have made it clear that the ADA applied to State prisons. However, that case dealt with art. 114, *id.* at 158-159, not with the ADA, which had not even been enacted at the time. Americans with Disabilities Act of 1990, 42 U.S.C. § 1201 et seq. Nothing in the *Layne* case purported to address the issue whether a yet to be enacted Federal statute would be applicable to our prisons, and it obviously did not address the split amongst the Federal courts that emerged after that act was passed.

[13]Shedlock correctly notes that in the pre-*Yeskey* era, more courts had concluded that the ADA did apply to the prison setting, while only a few took the contrary view. However, the issue whether a statutory right is "clearly established" for purposes of overcoming qualified immunity is not a matter of counting up the number of decisions that have gone each way and treating as "clearly established" whichever position has garnered the greatest number of opinions in support.

a clearly established right . . . ." *Key* v. *Grayson*, 179 F.3d 996, 1002 (6th Cir. 1999).

Since *Yeskey*, other courts confronting a defense of qualified immunity have held that the applicability of the ADA to State prisons was not "clearly established" until the Supreme Court resolved the split amongst the Circuit Courts of the United States Court of Appeals. See *Hall* v. *Thomas*, 190 F.3d 693, 696-697 (5th Cir. 1999); *Key* v. *Grayson, supra* at 1000-1002. See also *Gorman* v. *Bartch*, 152 F.3d 907, 915 (8th Cir. 1998); *Montez* v. *Romer*, 32 F. Supp. 2d 1235, 1243 (D. Colo. 1999); Crowder *vs.* True, No. 95C 4704 (N.D. Ill. Jan. 29, 1998); Fowler *vs.* Gomez, No. C-94-2679 FMS (N.D. Cal. Nov. 22, 1995). We agree. Accordingly, the defendants named in their individual capacity are entitled to qualified immunity for their alleged violations of the antiretaliation provisions of the ADA.

(ii) *Eleventh Amendment.* The Eleventh Amendment to the United States Constitution renders the States immune from suit, absent a State's consent to suit or a valid abrogation of that immunity by Congress. See *Trustees of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 363 (2001) (*Garrett*); *Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62, 72-73 (2000). The department contends that it is immune from Shedlock's suit for damages under the antiretaliation provisions of the ADA, because it has neither consented to such a suit nor has its immunity been validly abrogated.[14]

Shedlock argues that the State has consented to such a suit, because it has adopted art. 114, and thereby waived its immunity for State law claims that are comparable to the ADA. See *Erickson* v. *Governors of State Colleges & Univs. for*

_____

[14]This argument is made solely with respect to Shedlock's claim for alleged retaliation, and not with respect to his substantive claims under the ADA. While the immunity theories might extend to the entirety of Shedlock's ADA claims (a point we need not decide), any such immunity would be of no practical consequence in light of Shedlock's companion claims under the RA and art. 114. At no time has the department contested that it receives Federal financial assistance, which makes it subject to the RA, and the acceptance of such assistance is treated as a valid waiver of immunity with respect to suits under the RA. See *Clark* v. *State*, 123 F.3d 1267, 1271 (9th Cir. 1997). Nor has the department contended that it is immune from suit for violations of art. 114. We thus consider the department's asserted immunity solely with respect to the claim for unlawful retaliation under the ADA.

*Northeastern Ill. Univ.,* 207 F.3d 945, 952 (7th Cir. 2000). We need not consider whether the adoption of art. 114 and the enactment of G. L. c. 93, § 103, would operate as a waiver of immunity with respect to the substantive provisions of Title II of the ADA because, even if they do so operate, the waiver would not extend to the antiretaliation provisions of Title V. Neither art. 114 itself, nor anything in the enforcement procedures set out in G. L. c. 93, § 103, authorizes any claim for retaliation. It would be incongruous to conclude that by adopting the equivalent of Title II of the ADA, the State had waived its immunity with respect to distinct and separate claims of retaliation under Title V.[15]

Shedlock also contends that in the ADA itself, Congress has abrogated the States' immunity from suit. See 42 U.S.C. § 12202. There is no dispute that Congress intended to abrogate the States' immunity, but the department contends, and the motion judge held, that Congress lacked the authority to do so.

Congress may abrogate the States' Eleventh Amendment immunity in the exercise of its power under § 5 of the Fourteenth Amendment to the United States Constitution to enforce the substantive guarantees of that amendment. *Fitzpatrick* v. *Bitzer,* 427 U.S. 445, 456 (1976). In order to prevent violations of Fourteenth Amendment rights, Congress may "prohibit[] a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel* v. *Florida Bd. of Regents, supra* at 81. See *Nevada Dep't of Human Resources* v. *Hibbs,* 538 U.S. 721, 727-728 (2003); *Boerne* v. *Flores,* 521 U.S. 507, 518 (1997).

However, that § 5 power is not unlimited, and the validity of legislation pursuant to that power is subject to what is referred

---

[15]Shedlock also argues that because art. 114 was "modeled after" the RA, it effectively incorporates the entirety of the RA, including the RA's adoption of the remedies of Title VI of the Civil Rights Act. 29 U.S.C. § 794a(2) (incorporating into RA all "remedies, procedures, and rights" set forth in 42 U.S.C. §§ 2000d et seq.). Regulations under Title VI of the Civil Rights Act include a regulation prohibiting retaliation. See 34 C.F.R. § 100.7(e) (2003). Article 114, and the enforcement provisions of G. L. c. 93, § 103, contain no such cross-reference. Thus, while the substantive portion of art. 114 was "modeled after" the RA, it did not include anything equivalent to the RA's adoption of the "remedies, procedures, and rights" under Title VI of the Civil Rights Act.

to as the "congruence and proportionality" test. *Boerne* v. *Flores, supra.* The first step in that inquiry is to "identify with some precision the scope of the constitutional right at issue" in the legislation. *Garrett, supra* at 365. Then, the court must examine whether Congress "identified a history and pattern" of violations of those rights by the States. *Id.* at 368. Finally, the court examines whether there is "a congruence and proportionality" between the violations that Congress sought to remedy or deter and the "means adopted," i.e., the statutory rights and remedies enacted. *Boerne* v. *Flores, supra.*

In *Garrett, supra* at 360 n.1, 374, the Court held that Congress had not validly abrogated the States' immunity with respect to employment discrimination claims under Title I of the ADA, leaving open the question whether the abrogation of immunity would be valid as to claims of denial of access under Title II. Earlier this year, the Court held that the abrogation of immunity was valid with respect to Title II insofar as it applied to cases involving the fundamental right of access to the courts. *Tennessee* v. *Lane*, 541 U.S. 509, 533-534 (2004) (*Lane*). The plaintiffs in *Lane*, both paraplegics, had sued the State, complaining of physical barriers that had prevented them from gaining access to court houses. Depriving persons of access to court houses infringed various Federal constitutional rights, including the due process clause of the Fourteenth Amendment, the confrontation clause of the Sixth Amendment, and the public right of access secured by the First Amendment. *Id.* at 523. The Court then considered the history of Title II, and concluded that Congress had been concerned about "pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights," *id.* at 524, and that Congress's findings had documented that "many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities," *id.* at 527. Turning finally to whether Title II was "an appropriate response" to the violations Congress had uncovered, *id.* at 530, the Court specified that the appropriateness of the legislation was not to be considered with respect to the entirety of its potential applications, but was instead to be measured with reference to the specific constitutional right at issue, i.e.,

the right of access to the courts, *id.* at 530-531. Subjecting States to suits for money damages for failing to provide reasonable access to the courts was "congruent and proportional to its object of enforcing the right of access to the courts." *Id.* at 531.

Using the analysis of *Garrett* and *Lane*, we must first identify what constitutional rights are at stake in Shedlock's proposed application of the ADA, assess whether Congress considered and documented State violations of those constitutional rights at the time the ADA was passed, and finally examine the fit between the remedy adopted (suits for money damages) to the object of preventing or deterring such violations.[16]

However, Shedlock's brief on appeal fails to submit any argument beyond the first step of this three-step analysis. He claims that the antiretaliation provisions of Title V protect his First Amendment rights. However, he raised no First Amendment argument below and, in his brief on appeal, does not trace that First Amendment theory through the next two steps of the test. He points us to nothing in the legislative history of the ADA to suggest that Congress considered and documented violations of First Amendment rights by States, or considered and documented a problem of retaliation by States against persons asserting constitutional rights that would potentially be further protected by the ADA, or that concern about First Amendment violations is what underlies Title V of the ADA. Nor does he address the final step, the proportionality and congruence of the remedy adopted to whatever record might exist with respect to First Amendment violations. Instead, he suggests that framing the issue in First Amendment terms exempts him from having to satisfy the remainder of the test. We see no support for such an approach in *Garrett* or *Lane*. See *Demshki* v. *Monteith*, 255 F.3d 986, 988-989 (9th Cir. 2001) (immunity not abrogated for Title V retaliation claim in absence of legislative findings demonstrating pattern of retaliation by States). But

---

[16]The only court to apply this analysis in the context of prisoners' rights after *Tennessee* v. *Lane*, 541 U.S. 509 (2004), has concluded that the scope of Title II's prohibitions extend far beyond the Federal constitutional right they ostensibly would protect (the Eighth Amendment prohibition against cruel and unusual punishment), and thus fail the test of "proportionality and congruence." See *Miller* v. *King*, 384 F.3d 1248, 1275 (11th Cir. 2004).

see *Roberts* v. *Pennsylvania Dep't of Pub. Welfare,* 199 F. Supp. 2d 249, 254 (E.D. Pa. 2002). Where Shedlock has failed to present adequate appellate argument concerning how the final two steps of the *Lane* analysis would be satisfied here, we need not perform that analysis ourselves. We consider the issue waived.

3. *Conclusion.* For the foregoing reasons, we conclude that Shedlock has presented sufficient evidence to proceed with his claims for violation of the ADA, the RA, and art. 114 with respect to the denial of his request for a first-floor cell subsequent to obtaining the medical order of February 4, 1998, and that the motion for summary judgment should not have been allowed as to those claims. With respect to all other claims, we find no error in the entry of summary judgment for the defendants. Therefore, the summary judgment entered in favor of the defendants is reversed in part and affirmed in part, and the matter is remanded for further proceedings consistent with this opinion.

*So ordered.*