*Michael Rompa*, pro se.

*Kathleen M. McCarthy* for Steven Mastalerz.


MICHAEL S. O'BRIEN *vs.* MASSACHUSETTS INSTITUTE OF TECHNOLOGY & others.[1]
No. 11-P-45. September 25, 2012. *Handicapped Persons. Anti-Discrimination Law,* Handicap, Termination of employment. *Employment,* Discrimination, Termination, Retaliation.

A Superior Court judge awarded summary judgment in favor of Michael S. O'Brien's former employer, the Massachusetts Institute of Technology (MIT), on his handicap discrimination and retaliation claims. The judge ruled that O'Brien's claims failed because he had no reasonable expectation of establishing essential elements of his case. See *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 809 (1991). On count 1 (handicap discrimination), the judge ruled that O'Brien could not establish that he is a handicapped person within the meaning of G. L. c. 151B (the statute), and that even if he could establish his handicapped status, he would not be able to meet his burden of showing that the reasons given for his discharge were a pretext. On count 2 (retaliation), the judge found that O'Brien could not establish that he experienced adverse employment actions prior to his discharge, and that the discharge itself was too remote from the protected activity (a complaint to the United States Department of Labor) to establish a causal connection.

O'Brien appeals, claiming that he presented sufficient evidence to send his case to a jury. With respect to O'Brien's discrimination and retaliation claims against MIT, and viewing the record in the light most favorable to O'Brien, see *Lyons* v. *Nutt*, 436 Mass. 244, 245 (2002), we agree. This is not to say that MIT in fact discriminated or retaliated against O'Brien. That is a question for the jury on which we express no opinion. We hold only that the evidence

[1]Jack R. Stark and Donald J. O'Mara.

is sufficient to raise genuine issues of material fact that preclude the award of summary judgment on counts 1 and 2.[2]

1. *Background.* O'Brien worked at MIT's central utility plant (CUP) as a second-class engineer for approximately ten years, starting in 1997. Given the nature of the CUP's operations, engineers are expected to work overtime. Throughout his employment, O'Brien suffered from pain in his back and legs. He underwent two surgeries: in 2003, he had surgery on both legs, and in November, 2004, he had spinal surgery. Neither surgery was successful, and O'Brien continued to experience pain. In February, 2005, after his second surgery, O'Brien provided MIT with a letter from his surgeon explaining that because of continued pain, O'Brien's ability to work overtime was limited.

O'Brien subsequently tried repeatedly to obtain sick leave under the Family and Medical Leave Act (FMLA) and an accommodation that would excuse him from working overtime. These requests were accompanied by doctors' notes stating, inter alia, that O'Brien had chronic leg pain "that disrupts his sleep"; that he "likely [would] miss work 1-2 days per month"; that he had a neurological condition made worse by working long hours and that it was "important for his long term health that he not be required to work overtime"; and that he had lower extremity neuropathic pain, spinal stenosis, and lumbar radiculopathy, with "[b]urning pain [in] both lower legs that worsens after prolonged standing hence limiting time on feet." MIT rejected each request, generally stating that the medical documentation submitted "did not describe circumstances that would entitle [him] to leave under FMLA," and requesting that he submit additional forms and documentation.

In September, 2006, while O'Brien's request that he not work overtime was pending, one of his supervisors, Jack Stark, commented to another manager that he could not wait until the day he could fire O'Brien. In November, 2006, after O'Brien's request for an accommodation was formally denied, he filed a complaint with the United States Department of Labor (department). On April 11, 2007, as a result of negotiations with the department, MIT provisionally approved FMLA leave "due to a serious medical condition." In December, 2006, while O'Brien's complaint with the department was pending, another supervisor, Donald O'Mara, sent an internal electronic mail message (e-mail) strongly opposing an accommodation for O'Brien on the ground that it would set a precedent. The e-mail stated, "I have no interest whatever in accommodating [O'Brien] at all."

As we have noted, O'Brien first informed MIT that his medical condition affected his ability to work overtime in the beginning of 2005. Prior to that time, during his first eight years of employment, the only disciplinary action involving O'Brien was a single warning he received in January, 2002, for improperly closing a damper. However, following his first request to be

---

[2] We affirm the grant of summary judgment on O'Brien's additional claim of tortious interference against Stark and O'Mara. As the motion judge found, this claim fails because they were supervisory employees whose actions were governed by a collective bargaining agreement (CBA), and the claim is therefore preempted by the Federal Labor Management Relations Act. See 29 U.S.C. §§ 141 et seq. (1994); *Magerer* v. *John Sexton & Co.*, 912 F.2d 525, 530-531 (1st Cir. 1990). To the extent O'Brien argues that the claim is not preempted because his allegations of improper motive and means (discriminatory and retaliatory animus) involve actions outside the CBA, the argument is not sufficiently developed, and we do not reach it.

excused from working overtime until his employment was terminated in September, 2007, O'Brien received a number of verbal and written warnings and was suspended for a variety of infractions, including insubordination, failing to complete assignments, leaving his post without proper coverage, and abuse of MIT's sick leave policy.[3] A fellow worker, John Spinosa, submitted an affidavit stating that O'Mara and Stark "appeared to have two different sets of standards for performance in the CUP. One set of standards for . . . O'Brien and the other set of standards . . . for the rest of the workforce," and that he had "personally observed much of this discriminatory treatment."

As to the termination of O'Brien's employment, there is no dispute as to the following. On September 8, 2007, O'Brien was assigned to work a twelve-hour shift, from 6:00 A.M. to 6:00 P.M. At some point in the early afternoon, he was asked to start CUP chiller number one. During the "slow-roll" start-up process, O'Brien left the CUP to retrieve his truck in a nearby lot, bringing it back to the parking lot next to the CUP. He then washed the truck and a kayak attached to the truck's roof, drove the truck to a parking garage, and returned to the CUP. At the end of his shift, O'Brien left for a scheduled two-week vacation. Upon his return, O'Brien was informed by letter that his employment was terminated for "unacceptable" conduct in connection with having abandoned his post and for other disciplinary concerns.[4] Spinosa's affidavit stated that it was common practice to leave the chiller during the slow-roll process because the equipment did not need constant monitoring at that point, and that he was not aware of any discipline imposed on any other engineer for that behavior during his twenty-five years at CUP.

2. *Discussion.*[5] a. *Count 1 — handicap discrimination.* i. *Handicap status.* To establish that he is handicapped within the meaning of G. L. c. 151B, O'Brien must show that (1) his "condition, actual or perceived, constitutes a mental or physical 'impairment'[;] . . . [2] the life activity curtailed constitutes a 'major' life activity as defined in G. L. c. 151B, § 1(20), and its accompanying regulations[;] . . . and [3] 'the impairment substantially limit[s] the major life activity' " (citations omitted). *New Bedford* v. *Massachusetts Commn. Against Discrimination*, 440 Mass. 450, 463 (2003).

There is sufficient evidence on each prong to preclude summary judgment. First, there clearly is evidence that O'Brien's chronic pain constitutes a physical impairment. Second, there is evidence in the record demonstrating that this impairment limits at least two major life activities, sleep and work. Third, a jury could conclude that these major life activities are substantially limited by O'Brien's impairment.

---

[3]The frequency of reprimands escalated in August, 2007, when O'Mara reprimanded O'Brien three times in as many weeks, for infractions ranging from failing to wear his fire retardant suit to leaving the CUP without informing O'Mara.

[4]The letter of termination set forth a history of prior disciplinary actions and noted that O'Brien had been "counseled" on three occasions during the preceding month of August for improper conduct. (See note 3, *supra*.)

O'Brien's union pursued a grievance challenging the termination under the CBA. The matter proceeded to arbitration, and the arbitrator upheld O'Brien's termination.

[5]We review an order granting summary judgment de novo to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991).

The question whether an impairment substantially limits an individual's ability to sleep as compared to the ability of the average person in the general population "requires an individual, case-by-case assessment." *Shedlock* v. *Department of Correction*, 442 Mass. 844, 852 (2004). In his deposition, O'Brien testified that there were weeks when he would sleep only "one or two hours a night, three or four hours a night for a week or two . . . depend-[ing] on how many days in a row [he] had to work, what shifts [he] had to work." He would sometimes go for days with only four hours of broken sleep. Also, O'Brien's doctor noted that O'Brien "continues to have leg pain that disrupts his sleep" and he "will likely have exacerbations that require missing work intermittently." If the jury were to credit this evidence, they could conclude that O'Brien's ability to sleep is substantially limited in comparison to the average person. See *ibid.*

A limitation on work is "substantially limit[ing]" for purposes of G. L. c. 151B when the impairment "prevents or significantly restricts the individual from performing a class of jobs or a broad range of jobs in various classes." *Ocean Spray Cranberries, Inc.* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 632, 639 (2004). Given the evidence in the record, and the broad range of jobs in the Commonwealth that require overtime, the question whether O'Brien is substantially limited in his ability to work is, again, one for the jury.[6,7,8]

ii. *Pretext.* Next, we consider whether MIT has proffered legitimate nondiscriminatory reasons for terminating O'Brien, and, if so, whether O'Brien could meet his burden of establishing that the reasons given were a pretext. See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 821 (1997). It may, in fact, be true that O'Brien was terminated for leaving his post during the slow roll of chiller number one. Here, however, there is direct evidence of serious resistance by MIT to O'Brien's request to be excused from working overtime due to his medical condition, and to his applications for leave under the FMLA and for reasonable accommodation. O'Mara's internal e-mail and Stark's comment about wanting to fire O'Brien raise a jury question whether MIT's proffered reason is in fact why O'Brien was terminated or whether,

[6]MIT did not argue, and the motion judge did not reach the question, whether O'Brien could make out the second element of his prima facie case, establishing that he is a qualified handicapped person. See, e.g., *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 822 & n.11 (1997). We do not address the question.

[7]We observe that some Federal courts have found that, as a matter of law, inability to work more than a forty-hour week is not a "substantial limitation" on the ability to work for purposes of the Americans with Disabilities Act (ADA). See *Boitnott* v. *Corning, Inc.*, 669 F.3d 172 (4th Cir. 2012). However, these cases were decided under a construction of the ADA's "substantial limitation" language that was subsequently rejected by Congress in the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). In any event, G. L. c. 151B, not the ADA, applies in this case. See, e.g., *Dahill* v. *Police Dept. of Boston*, 434 Mass. 233, 240-243 (2001).

[8]With respect to the major life activities of thinking and concentrating, O'Brien stated in his affidavit, "I've endured numerous days and countless nights of private torture and tears and my ability to concentrate is often impacted." In light of our conclusions about sleep and work, we need not decide if this is sufficient to raise a genuine issue of material fact whether these major life activities are substantially impaired. Should the evidence at trial be sufficient to support such a conclusion, the judge will be free to instruct the jury on the point.

instead, it is a pretext, and O'Brien was terminated either because of his handicap or in retaliation for engaging in protected conduct, namely, filing a complaint with the department.

Evidence in the summary judgment record would also support a finding that, beginning about the time he first sought accommodation due to his medical condition, O'Brien was singled out for disciplinary action. In addition to O'Brien's deposition testimony, the Spinosa affidavit avers that there was one set of rules for O'Brien and another set of rules for everyone else.

b. *Count 2 — retaliation.* This claim is premised on the treatment O'Brien received after he filed his complaint with the department. He alleges that harassment by his supervisors, resulting in numerous verbal and written warnings, as well as his termination in September, 2007, were "adverse action[s]" entitling him to recovery. See *Mole* v. *University of Mass.*, 442 Mass. 582, 591-592 (2004), quoting from *Mesnick* v. *General Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992) (retaliation claim requires plaintiff to show that "he engaged in protected conduct, that he suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action' ").

There is no question that O'Brien's filing of the department complaint constituted protected conduct. Because a reasonable juror could conclude that the verbal and written warnings, as well as O'Brien's termination, were all "adverse actions" that, if shown to have been retaliatory, would entitle him to recover under the statute, MIT is not entitled to summary judgment. Under the retaliation provision of the statute, "adverse actions consist of a defendant's action 'to discharge, expel or otherwise discriminate against' the plaintiff." *Mole* v. *University of Mass.*, supra at 592 n.14. Any such action that "materially disadvantage[s]" a plaintiff is an adverse employment action for purposes of a retaliation claim. See *Psy-Ed Corp.* v. *Klein*, 459 Mass. 697, 707-708 (2011). Here, the less serious infractions ultimately were included among the reasons for imposition of the sanction of termination (see note 4, *supra*) and, therefore, could be construed as having materially disadvantaged O'Brien. See *Nye* v. *Roberts*, 145 Fed. Appx. 1, 6 (4th Cir. 2005).

3. *Conclusion.* The judgment is reversed as to counts one and two against MIT. In all other respects, the judgment is affirmed.

*So ordered.*

*Seth Stoffregen* for the plaintiff.
*Scott A. Roberts* for the defendants.